Good morning, Your Honors. Janelle Bell for Nina Salter, appellant in this case. We want to retain five minutes for rebuttal. Okay, you'll watch the clock. Your Honors, our contention that the district court erred in holding that our client had not stated a prima facie case based on her four causes of action based on the holding in the Vasquez case. We contend that our case is distinguishable from Vasquez in that in the Vasquez case, Mr. Vasquez lied about playing football after being told not to do so by his supervisor and asked one of the youth that he supervised to lie about the fact that they were playing football. Mr. Vasquez received a reprimand, was put in a temporary file and then transferred to a position that had no responsibility for youth. Mr. Vasquez reasoned that he was being discriminated against and received an adverse employment decision. And the holding in that case was that a subjective reasoning that he had been materially altered in employment does not constitute such altered employment. In this case, Your Honors, my client was asked to give false testimony in the connection with a lawsuit filed by another African American unit clerk at Washington Hospital. My client refused to do so. My client as a unit clerk had responsibility to answer the telephone. She wasn't directly asked to give false testimony. That was her inference. It was suggested to her that they wanted my client to testify on behalf of the hospital and deny Ms. Hunter's allegations. Well, if they thought it was, you're assuming that they knew that that would lead to false testimony. In this case, Your Honor, both Ms. Hunter and my client complained about the exact same issues concerning people saying that they smelled bad, people making comments about their skin color, and thus my client knew that Ms. Hunter's allegations were true. Well, I understand that, but you characterize it, you're characterizing what their intent was. That's an inference that has to be made. They didn't say we're going to give bogus testimony and we want you to be part of that. There was a strong inference that as a team player, my client would go along with whatever they wanted her to say. Okay. We contend that that is protected activity. Also in regards to that, until my client said she would not go along with the suggestion that she basically told the company line, my client had no problems and my client testified to that fact that she had no problems up to that point. After my client said she would not go along with what the hospital suggested that she give as testimony, my client was then told she had to prepare this end-of-the-month report. Prior to my client preparing the report, it was prepared by Anne Hunter, the person who is now suing them for discrimination. Could you clarify that because it was a little unclear. Your client was the chief or the head unit clerk, is that right? My client was the senior unit clerk on the ward. Senior unit clerk. Do this end-of-the-month report decide your client and her immediate predecessor? No. Prior to Anne Hunter doing the report, who is also African-American, it was done by the supervisor. She was referred to as the head clerk. Was her pay higher than the others? No, she just had seniority. Pardon? She only had seniority. She had been there longer than the other unit clerks. But it didn't result in an increase in pay over the others? I think she earned more because of the fact she had been there longer. Uh-huh. But as the senior unit clerk, she did not earn any more money than her step increases. But you're saying that the record is that only Hunter and Salter were the only two who prepared the end-of-month reports out of the unit clerk category? The evidence that's been submitted in this case, my client and Ms. Hunter were the only two unit clerks asked to do the end-of-the-month report. And both Ms. Hunter and my client complained about having to do it. Because I had the impression that at backup or occasionally some of the other unit clerks would do it on occasion. Am I mistaken on that? The other unit clerks were asked to prepare documents that were used to prepare the report. I understand that. They were not actually asked to prepare the report. And it's your client's contention that that job, the preparing of the report, was the obligation or job responsibility of whom then? It was the responsibility of her supervisor, Tommy Farley, and we submitted job descriptions for both Ms. Farley and my client, which shows that Ms. Farley had responsibility for preparing the end-of-the-month report. And it's also our contention that in regards to preparing this report, after my client refused to go along with the suggestion that she testify as Washington wanted her to do, that they then required her to take the report and prepare it somewhere else, which then changed her job from a sedentary job answering the phone, signing in patients to a job where she now is required to carry and lift boxes weighing over 50 pounds up and down a hallway to prepare these reports in places that were totally inappropriate for her to be working, as behind a screen in the emergency room where doctors are working on patients behind the curtain and other such locations totally away from her job location. And we're claiming that having... Could you just fill out that a little bit? Because, again, I was a little – there's a suggestion made that this was appropriate because the nature of the work that she was doing in preparing these reports was confidential and moving off to a different area was appropriate. What was her normal position in the – just physically? What was going on around her in her normal desk position? Physically, what was going on around her in her normal position was that patients would come into the emergency room, come to her desk, and register to be seen by a doctor. All right. Now, she was – so she would be constantly having people come up to her to – so she could transact that business, correct? So she could sign them in, find out what their issues were, basic triage, and have them take a seat. So how would she be able to do an adequate job on end-of-the-month report if she had to do that as well? Because prior to the time that my client refused to take their suggestion about her intended testimony, she was allowed to sit there at the desk and do the report and her job. So there's a clear causal connection. As soon as she complained, then they moved her. Exactly. And my client contends as soon as she said she would not tow the company line, they told her, well, then you can't sit here anymore. Take the report and go down there and do it. And that wasn't tied at all to the fact that she was complaining that she couldn't do both jobs at the same time? She eventually complained that she couldn't do both jobs at the same time because she wasn't sitting at her desk anymore. So she couldn't answer the phone, she couldn't register the patients and be up and down the hallway with these boxes behind the screen preparing this report. So as soon as they can report back from Ms. Salter, they brought somebody else in to do the unit clerk job and made her continue to do the other job. So is this a – this sounds like a work assignment. I understand the allegation and your claim that it's racially motivated. But in terms of this management, would it not be – are you saying that it's beyond some work agreement or whatever work allocation to not assign a senior unit clerk the job for pulling together all of these reports and performing that service that Salter just – not Salter, but Farley simply could not delegate that? Actually, Your Honor, Ms. Hunter was not a senior unit clerk and she was required to do it. And also when Ms. Salter – Let me step back and make it more clear. Ms. Farley, you're saying his job description made his end-of-the-month report obligations non-delegable? Ms. Farley testified that she could make it not – she could delegate that position to someone else to do. But in this instance, the only two people she delegated it to do were the two African-Americans who complained about it. And who was – what was Hunter's seniority? Ms. Hunter was the least senior of all the unit clerks at the hospital. She had been hired last.  And also, Your Honor, in regards to that same issue, once my client was injured and on workers' comp, someone else did do the report. So it wasn't as if my client had to be the only one to do the report. And who was it that did it? It was never identified who that person was. We assume it was Ms. Farley. When my client came back from workers' comp leave, Ms. Farley immediately told her she had to do the report again. So their contention that only my client could do the report is not true. In addition to that, Your Honor, at the point when my client came back from workers' comp leave, her restrictions prevented her from doing that report in that she could not lift or carry heavy objects. Ms. Farley was aware of that because Ms. Farley got all of the reports from the workers' comp coordinator, Carolyn Greer, and had to sign off that she recognized that these restrictions were imposed on my client. Ms. Farley's only accommodation to those restrictions was to say, well, put him on a chair and roll the chair down the hall. In addition to that, Your Honor, we have evidence that when the hospital filed a motion for summary judgment, again, there was suggestion that my client file a declaration opposing Ms. Hunter's motion for summary judgment, saying these things had not happened. When my client didn't oppose it, Ms. Farley signed a declaration saying these things did not happen. Ms. Salter did a declaration saying that Ms. Farley's statements were false and that these things did happen. It was after Ms. Salter filed a declaration on behalf of Ms. Hunter that it was then determined that doing the monthly report was now an essential function of my client's job. And it was included in her QIW analysis report, that it was an essential function of her job, even though they knew, based upon the reports from the workers' comp carrier and Ms. Greer, that including that as an essential function of her job would make her a QIW employee and unemployable anywhere in the hospital. Can I ask you to address the racial claims, racial harassment? I didn't quite understand, well, two things. First of all, on the incidence of this, obviously accepting the allegations is true, offensive remarks about bad smell. How many times did that? I've testified that this person, I can't think of his name at the moment, but this person, every time he came on the floor, this happened every day, would come on the floor and he'd hold his nose and he'd fan the air to say that both my client and Ms. Hunter smelled bad. There was a flyer that was generated about personal hygiene that did not come from the hospital, that was placed on each of their desks. Let me ask this, the district court judge said that your client's testimony in deposition was that this had only happened once, and then when she had her declaration for opposing the summary judgment, she said it happened all the time. Do you have that deposition language or testimony that you can read to us? The court pleases, I can provide it to you in my rebuttal. But there is testimony from my client that the flyer issue only happened once, but my client testified that the issue about the odors and the other issues occurred every time this person came on the floor. So you're stating that there's no real discrepancy between her deposition testimony and her declaration of her contention. Were there complaints made to the supervisor in connection with these statements and indications to the supervisor that there was a racial component to it? Yes, in this case, both Ms. Hunter and Ms. Salter made comments to Ms. Farley, complaining about this person making these racial comments that they smelled bad. Ms. Hunter specifically said that she felt it was racially motivated. Ms. Salter said she felt it was because she was black. So the hospital, you know, cannot say they didn't know that both Ms. Hunter and Ms. Salter were making complaints about disparate treatment based on the fact that they were black. Moreover, the Title VII's mandate is that whenever an employee makes a disparate treatment complaint, the employer is required to investigate that and to alleviate whatever actions are happening in the workplace. For the defendants to say, well, she never said it was because she was black, negates their obligation to do that investigation. If a person is making a complaint about a disparate treatment, it's on the employer to ask them, on what basis are you making that complaint? To say, well, because she didn't say the magic words, it's because I'm African-American, does not then absolve them from any responsibility to take action on those complaints or to do something to alleviate it. In this case, Ms. Salter complained to Ms. Farley several times, but Ms. Farley did nothing to alleviate the situation. She then went to Ms. Romero, which then totally made Ms. Farley angry at Ms. Salter and then to increase the retaliation and harassment of Ms. Salter. And we're also contending, Your Honor, that in this case, Washington Hospital's contention is that because they never terminated Ms. Salter's employment, our constructive termination claim fails. I want to point to the court that as of the date of this argument, Washington Hospital has still never terminated Ms. Salter's employment, even though she's worked somewhere else for the last two years. So we don't believe that the basis that the hospital still considers her an employee, even though she hasn't worked there since 2001, to be a basis for denying a constructive termination claim, where the hospital determines that there are no jobs for her at the hospital and she's not allowed to come back there, and in fact she's working somewhere else over that two-year period of time. And my five minutes is just about up. Okay. You can save the... I'm sorry? Did you want to save your... I want to save my five minutes. Yeah. Okay. Save. Good morning, Your Honors. May it please the Court. I'm Mark Van Brussel for the defendant, Washington Township. And I would like to address each of the three claims that were resolved against the plaintiff and in the course of that also answer some of the questions that the panel's been raising. I'll start first with plaintiff's claim of work environment, hostile environment, harassment, racial harassment. And the elements of that claim are verbal or physical conduct of a racial nature that renders the work environment abusive. It has to be severe and pervasive, and it has to be unwelcome. And analyzing the record before the district court and before this court, when you look at each of those, first of all, you don't have any conduct by the defendants of a racial nature. The four discrete instances that the plaintiff has identified, and I'm only going to focus on the four, because the other things that she later puts into her declaration in opposition to summary judgment and the things that the appellant has liberally put into her brief either have no support in the factual record or simply contradict the four instances that she identified during discovery. The first is that this EMT once held his nose as he walked by her workstation. Well, is that accurate? Certainly the contention is that it happened many times and that it happened out of the presence of the supervisor. Right. And I noted your question, too, to the appellant's counsel. And, Your Honor, I couldn't find, I looked, but I know the record in the deposition testimony has been identified where Ms. Salter testified to the one instance where the EMT did this. And in her declaration and in her brief, she expands that and says this went on all the time, sometimes every day, sometimes not, and that's simply not what she testified to during discovery. This is all added after the fact. In any case, Your Honor, that holding his nose on this one occasion or even if it happened more than once is a race neutral. Well, I certainly would disagree that that's race neutral if it happened. Okay. Well, I wouldn't push that argument. Okay. I won't then, but I think it is a race neutral action. Well. And I'll get to my next point, and there may be room to disagree here, too, but her other discreet instance was a doctor who apparently complimented the plaintiff on her hair extensions and then made a remark or made a neighing sound as a horse. And, again, I would submit that that's a race neutral remark. There again, I would disagree with you if that happened. That's not race neutral. Okay. I won't push it, but I know many Caucasians. Having a high school girl, I know other women of all races that have hair extensions, and I don't believe it's race motivated. Finally, we have a doctor, another doctor not identified, who apparently was showing pictures from his trip to New Guinea, and he showed the pictures to the plaintiff, and in plaintiff's presence and without other's presence, said that he didn't see how the New Guinea people apparently had darker skin color than the plaintiffs. And I acknowledge that that remark is racially, has racial content. I acknowledge that maybe it was tasteless or insensitive or boorish, but it was a doctor. It was not a supervisor or manager of the hospital. And the remark was, you know, showed no animus. It was simply tasteless. What about the flyer that was placed on their desks involving personal hygiene? Your Honor, I don't believe the record establishes that issue. And I don't, they have not established where the flyer was left, the purpose, the motivation behind it, who left the flyer. I think there is, and they haven't seriously argued on the appeal, nor did they in opposition to summary judgment, based on any record support, that there was a flyer that could be anything. Even if you make the leap and draw all the inferences that they want from this flyer, they've not identified who did it or that it could be anything other than a stray remark, even, again, if you choose to interpret the flyer as somehow racially motivated. Thank you. If I could ask you to go back to the EMT. And I was looking at the record, and it's my recollection, and I think it is at pages 11 and 12 of the judge's order in this case, the judge points out that on the one hand, in the testimony of Ms. Salter, that she indicated there was a single incident. And then in the declaration, she indicated that it happened nearly nine times a day, nearly every day. And on the next page, the judge indicates that he concluded that this was a sham as far as this was one of the matters, it constituted a sham. Is that a correct reading of the record? That is a correct reading, Your Honor. And as I said, you'll find, and it is cited, the two pages of her deposition testimony, where she identified the one instance where this occurred. And her declaration in the aftermath is just the fabrication that is completely contrary. Was that deposition filed? Yes. The deposition was lodged with the court. Did you put that portion in the excerpt of record? Yes. And I'm sorry if the court doesn't have that. I don't have it with me. Yeah, I'll endeavor to find that. The district court cites deposition pages, it looks like, 276, 289, and that, and 281, those pages. Thank you. Okay. So that would be the supplemental excerpt of record 155. Which is the testimony at the deposition, page 276. And so she's asked, were there other incidents, that is, of alleged harassment? She says, the one, and she identifies Michael Plotzbecker, an incident where he was saying it stank in the area where the clerks, where I sat, and came in holding his nose. And she goes on to testify about that one incident. And then it's only later, faced with summary judgment and on appeal, that this becomes expanded considerably. Just so it's clear, the 289, 276 and 289 apparently are the New Guinea remarks. The only reference in the district court opinion is the 281. Oh, 281. And I only have 280 in mind. Okay. Well, I would, yeah, I would refer the Court to 276. And the plaintiff, whether it was one instance or whether it was a dozen, never objected to it, never indicated it was unwelcome, never complained to any supervisor about it. Ms. Bell, in argument here today. Well, I think the contention is that she did tell the supervisor about it, and that she then concluded that the supervisor had been told because he then did it always out of the presence of the supervisor. Because then he did it out of the presence. Yes. Your Honor, I think if you search the record, you will not find any evidence that Ms. Salter ever complained to any supervisor about this remark or any remark by anyone of her stinking or anything like that. I think that is simply absent from the record. In fact, in argument here today, Ms. Bell says, well, both my client and Ms. Hunter said that someone was complaining they smelled bad. And there's simply no record support for that. And, again, Ms. Bell today and another instance this morning said both have been complained. She's trying to fold her case or her claims into claims that Ms. Hunter may have made, but they're not in the record before this Court. So, and then finally, the final of the four incidents would be her waiting in the emergency room with her daughter, who has a temperature, and claiming that this was somehow disparate or conduct that rendered her work environment abusive because they didn't call her daughter right back to be seen in the ER when white patients apparently went right back all the time. It's simply too vague to allow any intelligent analysis as to what was going on in the ER, what the state of her daughter was. And I think that anybody who's ever been in an ER knows that there are any variety of factors that could prevent someone from being seen. We've all done that. So of the four incidents, I, though I won't push it, have identified one that had racial connotations, and there was no animus, no epithet, nothing like the racial, racially charged epithets and vulgarities and insults that were present in any number of a dozen cases where summary judgment was granted and was upheld by other circuit courts and by this court. At least the four cases that we're relying on are Vasquez, Brooks v. San Mateo, Cortan, and Sanchez v. City of Santa Ana, all cases where I would submit that the racial connotations were far more severe and pervasive. And I call in Cortan, though, which involved Korean. Is that right? The Cortan. It was Korean, wasn't it? It was actually, I believe, a sexual gender. I'm thinking of another case. Maybe you're thinking of Manat. Okay. The Manat case involved a woman of Chinese ancestry. That was this Court's, one of this Court's recent decisions. Can I ask you to address, if you would, the work assignment on the end-of-month reports, the heavy boxes? Yes. It seems to be, at least on the record, there's some serious question about why the two African-Americans were the ones that had to assume the burden of this. Can you give your best shot on why? Yes. I don't believe the record evidence shows that preparing that end-of-the-month report was delegated or delegated to Ms. Bell in oral argument. And I believe the record will show, and that Ms. Salter testified, that there are others who did that report. Tommy Farley, who is a female and who was the supervisor, did the report. She would also delegate it to others. There's no record evidence that preparation of the end-of-the-month report was confined to the two African-American unit clerks. So I know that Ms. Salter did identify, say, at least a registration clerk had done it in addition. Right. What's the hierarchy here in this? I frankly don't know, Your Honor. Does the record show? The record shows that the hierarchy, you know, a unit clerk, a registration clerk, Farley. Yeah. I'm sorry. I don't believe the record before the court would adequately demonstrate. They're not under a collective bargaining agreement? I believe they are members of the bargaining unit. Well, if they are, is there some proviso in job descriptions that allows employees who think they're working out of class to receive it? Yes, there would be, though it's not in this record. The record evidence does show that Ms. Salter enjoyed doing the end-of-the-month report. She, again, claims that somehow this was altered after she, as she says, refused to commit perjury, which is absolutely groundless in terms of the record. No one, as the court I think recognizes, ever asked her to commit perjury or testify against Hunter or testify in favor of the hospital. They simply asked her to testify. There was nothing protected about that. But, you know, there's simply no evidence that the report was confined to her, that the report or preparing it was outside of her job description, or that it was an adverse employment action. And indeed, if things like that and the host of other things that she has brought forth that she claims showed some adverse employment actions, such as preparing end-of-the-month reports or having to do something that might take her away from the unit desk, or, you know, she cites a host of things that I think this court has already recognized and stated. If the court were to begin to analyze these things as adverse employment actions, you would be enmeshing the court in micromanagement and personnel decisions. These simply are not the types of conduct that rise to the level. Well, there's more than just calling an adverse employment action doesn't answer the question. I think what we have to assess in this case is the totality of what she claims went along with the end-of-the-month report, that is, the carrying the boxes, being moved away and isolated. Right. And, Your Honor, of course, carrying boxes, as the record will show, she didn't need to carry boxes. She could have pulled the folders for the end-of-the-month report out of the boxes. She did, in her job description, and in any case, she did lift boxes. And indeed, it was while lifting boxes that she suffered her first employment injury, which was back in 1997. So there is no issue and can be no contention that boxes, lifting boxes, based on the job description, based on the fact that this is a clerical job, it had lifting requirements, and there's simply no basis to maintain that somehow this was foisted upon her after she engaged in some protected activity. Indeed, the record evidence shows she was doing this sort of work before she was asked to give testimony in the Hunter matter, before certainly she was, before she signed the declaration for her co-employee and Hunter. So I, and again, I've discussed the severe and pervasive and a host, at least half a dozen decisions from this circuit, that I think, based on the findings there, you could not find that element in this hostile environment claim. On the retaliation, again, she has to show protected activity. And as I've said, the refusal to commit perjury, and the court recognizes, is not something that occurred. No one asked her to perjure herself. She simply says it over and over, but it's devoid of record evidence. Then she says that her other activity protected was filing this declaration or signing a declaration on behalf of Ann Hunter. And there's simply no causal link, because her engaging in that protected activity on July 5 preceded by three days or three weeks or three months the hospital's determination that it had no jobs available to her with her lifting restrictions. She was out on a worker's comp leave. If I could ask you to address just for just a moment the notations about absenteeism in the report and the complaint that that was in some way retaliation. The notations of absenteeism in her personnel file? I'm sorry, I don't know that the record supports that anything was put in her personnel file. I know there was a general denial, but was there anything more specifically? And that was in response to the several notations, as I recall. And was there anything in the record indicate when those notations were actually entered in the record, whether it was before or after the record? Not that I know of. And I'm sorry if I can't focus on that, because I have not seen in any of the appellate briefs nor in opposition to summary judgment any focus on that. So I don't believe the record is sufficiently developed to show when any of that occurred. Well, the allegation is that it was in the file and that it was put there after her complaint. Yeah, I don't believe that she has any admissible evidence that would support that. Did you investigate that? Did the hospital investigate that? No, did you? Did I myself? Yeah, I apologize, Your Honor. I simply did not focus on that because, as I said, I've not seen that focused on in any of her claims here, and nor have I seen record evidence, admissible evidence, that any absenteeism notations were put in her personnel file after she engaged in some protected activity. And my time is up, and I'm sorry. The only activity that really she has as a protected activity is her signing a declaration on behalf of Ms. Hunter, and 11 days later, Ms. Salter went on a workers' comp leave, and there's no evidence that in those intervening 11 days, these statements regarding absenteeism or anything went into her personnel file. Well, either it did or it didn't. Open the file and you'll look. Yeah. And the contention is that it's there. Yeah. I'm sorry. I can't respond to that. Okay. Time is up. Thank you. Judge Fletcher, I can respond to your question about the personnel file issue if you would like me to do so. I would. Okay. The issue of the personnel file came up in regards to the court relying on Vasquez to grant defendants a motion for summary judgment. Before the lawsuit was filed, my client went down to the personnel office and dated and initialed every document in her personnel file. When I deposed the human resources director, Vivian Young, I asked her to bring Ms. Salter's personnel file to the deposition as one of the document demands. When we looked through Ms. Salter's personnel file, her permanent personnel file, a tracking report documenting disciplinary actions for misconduct was not dated and not initialed by Ms. Salter, indicating it had been put there after the date that Ms. Salter went there and dated and initialed her file. Similarly, in the Ann Hunter case, a document was put in Ms. Hunter's file saying that Ms. Hunter was aware she was on probation. Ms. Hunter had done the same thing, dated and initialed her file. We had to hire a handwriting expert to testify that Ms. Hunter had not signed that document. And in the Vasquez case, the allegations were true and put in a temporary file. In our case, the allegations were false and put in her permanent personnel file. If I could ask a question about that, counsel. Was the document that was added a summary of preexisting records in the file? Is that what the new document consisted of when you said that it listed the absentees? Was it a summary of what was in the file itself? It was a completely wholly new allegation that Ms. Farley had disciplined my client previously on a number of dates for absenteeism. Ms. Farley had never done so. So there was no documentation in the file to support that tracking report. But did the record reflect that there actually were absentees on the dates? The pages that she initialed, did those indicate that she was absent and that this – did that reflect that? Did the record reflect that? Actually, Your Honor, if the court were to review the actual tracking document, the court would see where there were dates that were written in on the tracking report. They were then erased and new dates were written in on that tracking report. So the original dates did not correspond to my client's dates that she was absent. The ones that are erased and written over again do correspond to those. But the issue is whether or not my client's absences were excused. Only unexcused absences are the subject of that tracking report. And what does the tracking report say as to discipline? It said that my client had been counseled many times about excessive unexcused absenteeism and we've inferred to report to work when, in fact, there was nothing in her personnel file that supported any of those statements. And you say that came up in the context of Vasquez? Of the Vasquez case. On what issue? On the issue that there was a report placed in Mr. Vasquez's personnel file by a supervisor concerning the incident of the football game. But on what of your issues were you proffering it on? Constructive discharge? Retaliation? In regards to retaliation. Mr. Vasquez claimed because it was put in his temporary personnel file that that was retaliation. However, in that case, the allegation was true. After a year, it was removed. Okay. In regards to the issue about the ENT, I refer the Court to my except for record 68, the subject's deposition on page 280 of the deposition and 41 of my excerpt where it talks about the EMT, Mr. Platzberger, making comments about my client and what had happened on more than one occasion. I refer you to lines 19 through 24. And may I please, Court, may I read it to you? Please. Question. Is there any reason why you never reported it to anybody? I just didn't report it. Was it not that big a deal? Was it? It was a big deal. You never worked with another white unit clerk, did you? There's white clerks there that were there in the morning that came in, and in the afternoon when they came in, the change of shifts. He didn't do it to any of them. They were sitting at the desk, and he would walk up and would be laughing and hold a conversation with them. And when I came over, he's holding on his nose, and they are snickering and giggling and making fun. Would be laughing in case there's more than one, had happened more than one time. Well, no, wait, that's it? I'm sorry? You're saying they would be? That's the whole? The point is, Your Honor, that Mr. Andrada. That that's more than one? Right. And Mr. Andrada did not follow up that answer and ask her how many times did that happen. Well, in 1976, the deposition says, okay, so there were incidents. The one, Michael Plotzbecker, was an incident where he was saying it stank in the area where the clerks where I sat at. The clerk desk stank when he came into work holding his nose when he passed by my desk. Right, when he came to work. They never asked her how many times did that happen. So you're saying that, when she said there was an incident? She said that's one of the incidents. Yeah. But they never asked her how many times did Mr. Plotzbecker do that. So my client's declaration is not inconsistent with her testimony. And then in regards to why she did not complain, on page 499 of that same deposition, it says any particular reason why you didn't answer, fear of retaliation, because my client saw what happened to Ms. Hunter when she complained. Our issue, Your Honor, in terms of my client being made to do the end-of-the-month report, was that my client was the only person whose essential job function included doing that report. My client's essential job function did not require her to do that report. By putting that as an essential job function in her job description, Washington Hospital knew that she would not be able to work anywhere in the hospital. Now, was that because of lifting boxes? That happened after Ms. Hunter. I mean, that she wouldn't be able to work. Right, because she had lifting restrictions. Counsel has argued that that was part of her job description without doing the end-of-month reports, that as a clerk, even a clerk generally, she had to lift boxes. In general, my client lifted a clipboard that contained four or five pieces of paper. It wasn't part of the job description. Right. To lift boxes. Right. The heaviest thing my client ever lifted in her regular job was a clipboard. Let me make my question clear so your answer can be clear. Counsel for the hospital has argued that it was not an adverse employment action to have her do the end-of-month reports and have to, if she did, lift boxes, because part of her undisputed job description as unit clerk was that she might have to, and he alleged, the record would show, maybe it doesn't, but that she actually did have to lift boxes as a unit clerk, not for the end-of-the-month reports, but that went with her job description. So are you saying that it was only because of the end-of-the-month reports she couldn't get a job anywhere else in the hospital because it added the requirement to lift heavy boxes? It's our contention that the end-of-the-month report was the reason why my client went on workers' comp disability twice. Each time her restrictions were to prevent her from doing the end-of-the-month report. Okay. So before, so the first time she went out was also because she lifted boxes? Exactly. Because of the end-of-the-month report. The end-of-the-month report. She did not hurt herself until she did the end-of-the-month report. Okay. And it was not part of her job description, you say the record shows, to lift heavy boxes? Not of the weight that the end-of-the-month reports require. And where is that in the record? It should be in my declaration section where I attach the copies at 299 in Excerpt 69, where it lists Ms. Salter's job description and the fact that her restrictions are to not lift or to lift heavy objects and one of my daily job requirements such as the end-of-the-month report. So you're saying that without the essential function of end-of-month report being added to unit clerk, she would have been able to do that job? Exactly. Okay. All right. Your time is up, and we appreciate the argument of both parties. Thank you, Your Honor. Thank you. All right. The next case that was on calendar and has been dismissed, Hobbs v. Clark County, is no longer on, so we'll proceed to the last case on calendar, Reliance Insurance Company v. St. Paul Fire and Marine Insurance. Thank you, Your Honor. Thank you, Your Honor.
judges: B. Fletcher,fisher, Roll